### BISCHOFFSHEIM *v.* BROWN *et al.*

*(Circuit Court, S. D. New York. March 19, 1888.)*

RAILROAD COMPANIES—BONDS AND MORTGAGES—TRUSTEES.

The complainant's firm were agents for a railway company to negotiate certain mortgage bonds, and account for the proceeds to trustees. They negotiated the bonds, and became accountable for the price, but subsequently bought them back in their own interest, and led the company to suppose that they had never been negotiated. Subsequently they made a loan to the company upon a pledge of the bonds as collateral security, and by the terms of the agreement of loan the trustees of the company (who had the equitable title to the proceeds of all the bonds pledged) agreed to treat the loan as a trust fund, and disburse it for certain specified objects. In a suit brought by the complainant, as survivor of the firm, to enforce the agreement, alleging that the trustees had appropriated the money to foreign objects, and seeking to compel them to account, it appeared that the loan was made in entire ignorance of the fact that the bonds had been negotiated, and that the trustees were entitled to a larger sum then in the hands of the complainant's firm than the sum loaned. *Held,* (1) that a court of equity would not, upon such a state of facts, assist the complainant, because he did not come into court with clean hands; (2) that the trustees could invoke the principles of equitable set-off to defeat the action.

Bill in Equity.

Bischoffsheim, survivor of the firm of Bischoffsheim & Goldschmidt, complainant, filed a bill against J. C. Brown and Jesse Seligman, to re-

cover certain moneys alleged to have been paid to them as trustees for complainant's firm, and applied by them contrary to the terms of the trust, in the matter of the loan made by them to the New York, Boston & Montreal Railway Company.

*Evarts, Southmayd & Choate* and *B. H. Bristow,* for complainant.

*Bangs, Stetson, Tracy & MacVeagh,* for J. C. Brown and Jesse Seligman.

*C. W. Bangs,* for J. & W. Seligman & Co.

*Cary & Whitridge,* for Brown Bros. & Co.

*Porter, Lowrey, Soren & Stone,* for the New York, Boston & Montreal Railway Company.

WALLACE, J. The complainant is the survivor of the former firm of Bischoffsheim & Goldschmidt, of London, and has filed this bill to recover the sum of $917,182, advanced by that firm to the New York, Boston & Montreal Railway Company, of which sum $294,444 was advanced September 1, 1873; $269,937 was advanced September 15, 1873; and the balance was advanced on or about October 3, 1873. The averments of the bill are that these moneys were received at these dates by the defendants, John Crosby Brown and Jesse Seligman, as trustees for Bischoffsheim & Goldschmidt, to apply the same towards the construction and equipment of the unfinished railway of the company; that they applied the fund in great part to foreign purposes; and that before the suit was brought the railway enterprise became abortive, and it was impossible to carry out the purposes of the trust. It is further averred by the bill that the banking firm of Brown Bros. & Co. and J. W. Seligman & Co., the members of which are named as defendants, received portions of the fund from the trustees, with notice of the trust and of the misapplication of the fund. The bill prays for an accounting, and for other relief.

In the view of the case which has been reached, the material facts may be briefly stated. On the 14th day of March, 1873, Bischoffsheim & Goldschmidt entered into an agreement with the railway company by which they undertook to market in London $6,250,000 of an issue of $12,250,000 of the first mortgage bonds of the company. The defendants, John Crosby Brown and Jesse Seligman, were trustees under the instrument known as the "Disbursement Trust Agreement," by which the proceeds of the whole issue of mortgage bonds were to come to their hands for the purpose of being appropriated and distributed to various beneficiaries and objects, in part for the payment of designated creditors and in part for the construction of railway for the company, in the manner particularly specified by that instrument. By the contract made between Bischoffsheim & Goldschmidt and the railway company for marketing the bonds in London, the former were to negotiate them to the public at prices which would produce the company 90 per cent. in currency, (except as to $839,000 of the bonds,) less specified commissions and charges; the proceeds were to be at the disposal of the company in monthly installments, as payable by the terms of the subscription for

the bonds, and subject to the order of the company, or the order of the disbursement trustees, on the 6th day of each month; and Bischoffsheim & Goldschmidt were to account to the company for the proceeds of all the bonds subscribed for by the public, and allotted by them, less the commissions, etc., which they were authorized to retain. The contract also provided that Bischoffsheim & Goldschmidt should have a call or option to purchase the bonds at 80 per cent. for $839,000, and 90 per cent. for the residue, until July 31st next ensuing; should in no event be bound to account for any amount beyond that price; and should have the right to buy and sell and deal in the bonds for their own account and benefit, as though they were not the agents of the company to negotiate the same. Immediately after the making of this contract, Bischoffsheim & Goldschmidt issued a prospectus, offering the bonds to the public for subscription at £180 for each $1,000 bond, payable £10 on application, £20 on allotment, £40 May 2d, £40 June 3d, £40 July 1st, and £30 August 1st. Applications were received by Bischoffsheim & Goldschmidt largely in excess of the bonds offered, and within a few days the entire $6,250,000 were subscribed for and allotted unconditionally, and the £30 per bond payable on allotment duly paid by subscribers. The bonds were in very great demand; but only a small part of them, certainly not more than about $2,000,000, were allotted to the general public, although about $10,000,000 were applied for by the public. The greater part, viz., $4,166,000 were allotted to a syndicate, known as the "Paris Syndicate," friends of Bischoffsheim & Goldschmidt, who were interested with Bischoffsheim & Goldschmidt in manipulating the market so as to advance the price. March 27th, Bischoffsheim & Goldschmidt notified the company of their desire to exercise their option of purchase, and called for the delivery of the $839,000 of bonds which they had a right to purchase at 80 per cent., and $4,166,000 which they had the right to purchase at 90 per cent., being $5,000,000 in all. From that time thenceforth Bischoffsheim & Goldschmidt led the company to believe that this was the whole amount of bonds actually negotiated by them. They never distinctly asserted that no more had been negotiated, but insisted that they were accountable for $5,000,000 only, and beyond that statement maintained a reserve which was effectual to lead the officers of the company to suppose that no more had been negotiated. The latter were also led to that belief by the statement of one McHenry, who had been an agent of the company, and was at the time supposed to be acting in its interest, but who was in fact in the interest of Bischoffsheim & Goldschmidt. This statement was contained in a letter from McHenry to the company of the date of March 27, 1873, in which he wrote that for some reason a revulsion of feeling had set in against the bonds, "arising, perhaps, from so many being disappointed in not receiving allotments," consequently the whole capital had been on the market, and Bischoffsheim, for the safety of the loan, had been compelled to purchase it. Although the statements in this letter were false,—because over $4,000,000 of the bonds had been permanently placed with the Paris syndicate,—the officers of the company were not aware of it. Shortly

after the call of Bischoffsheim & Goldschmidt, the company delivered to them the remaining 1,250 bonds. Bischoffsheim & Goldschmidt never rendered any account of the disposition of these bonds. In September, 1873, the company, being in urgent need of money, sent its agents to induce Bischoffsheim & Goldschmidt to advance what was needed. Bischoffsheim & Goldschmidt finally consented to advance the sum which this suit is brought to recover, and a contract was entered into by which the company pledged 1,250 of the bonds then in the possession of Bischoffsheim & Goldschmidt as collateral for the loan. That agreement, among other things, recited that the money advanced by Bischoffsheim & Goldschmidt was to be paid to John Crosby Brown and Jesse Seligman for the disbursement thereof in completing the railway "under a trust for that purpose already in existence." The agreement was formally reduced to writing about two weeks after the time when its terms had really been arranged, and after the sum of $294,444, and the further sum of $269,937, had actually been advanced by Bischoffsheim & Goldschmidt. In the mean time Bischoffsheim & Goldschmidt had sent an agent—one Cassel—to New York, and the formal agreement was executed there, September 29th, and delivered to him there by the officers of the railroad company. Simultaneously with the delivery of this agreement, a letter was delivered to Cassel, signed by Brown and Seligman, which contains the alleged trust sought by the bill to be enforced. The latter was addressed to Bischoffsheim & Goldschmidt, bore date September 30, 1873, and after acknowledging the receipt through cable transfers of the two advances already made, read as follows:

"We understand that these sums, with such further sum as you may place in our hands on or about October 1st proximo, is so placed as a special fund to be disbursed by us for account of the completion of the construction of the New York & Boston Railroad, and the purchase of rolling stock of the New York, Boston & Montreal Railway Company, not exceeding the limit of the allotments made in the disbursement trust to these two accounts, and not as part of the proceeds of the first mortgage bonds coming into our hands under the consolidation and disbursement trust agreement; and, so far as we have any control over the matter, we assent to the arrangement made by your firm and the New York, Boston & Montreal Railway Company, by contract dated September 29, 1873."

The questions mainly litigated in the case, and to which the evidence is largely addressed, are as to the meaning and effect of the promise contained in this letter, and whether moneys advanced were disbursed conformably with its terms by the trustees. Although the bill of complaint was filed in 1877, the testimony of the complainant was not taken until the summer of 1881, and he then testified that his firm never collected or received any money as proceeds of the bonds pledged; and it was not until the spring of 1887, upon the examination of certain witnesses in London, that the fact was elicited that March 26, 1873, Bischoffsheim & Goldschmidt had formally notified the Stock Exchange of London that the whole $6,250,000 bonds which they had undertaken to negotiate had been unconditionally allotted to the public, and the sums due upon allotment had been paid thereon. Further investigations were instituted by

the defendants after learning this fact, and they discovered and proved that Bischoffsheim & Goldschmidt opened an account with the Imperial Bank, Limited, of London, in the name of the railway company, and that in this account credit items were entered for the various installments payable upon a subscription aggregating the subscription price for the whole of $6,250,000 of bonds. Thereupon the defendants gave notice that they should apply for leave to amend their answers, so as to allege that when the moneys in suit were loaned, Bischoffsheim & Goldschmidt had in their hands more than the amount loaned, as the proceeds of the negotiation of the bonds, and belonging to the company. This notice was given before the complainant's evidence was closed, and when there was ample opportunity to meet the new issue. The complainant has attempted to meet it; but the only evidence he has produced is his own testimony, which is, in substance, that he bought back the bonds, or rather the scrip certificates which were in circulation prior to the definitive delivery of the bonds, in order to sustain the market, and kept up payments in the account with the bank so that the transaction should appear regular, and in order to keep the scrip alive. No attempt was made to fortify this testimony by the production of his own books, or by any corroborative evidence. It is in conflict with the testimony given by him in 1881. Bischoffsheim & Goldschmidt never informed the company that such transactions had taken place. Their silence is significant, and especially so in view of their enigmatical answer to inquiries by the company at the time, which naturally called for an explanation. After receiving their letter of March 27th containing the call for $5,000,000 of the bonds, on April 10, 1873, the president of the company wrote them calling attention to the fact that he was advised by cable of the allotment of the whole $6,250,000, and stating that he should forward that amount in place of the $5,000,000 called for. April 24, 1873, Bischoffsheim & Goldschmidt answered that letter as follows: "We beg to state that, as stated in our respects of March 27th, only $5,000,000 of your company's first mortgage bonds have been purchased by us." The company knew that Bischoffsheim & Goldschmidt had exercised their right to purchase that amount of bonds. No information on that point was necessary. It is entirely obvious that this curt communication was meant to silence further inquiries. The contract between Bischoffsheim & Goldschmidt and the company gave Bischoffsheim & Goldschmidt no authority to buy back bonds for the company which had been actually negotiated, although it did allow them to do so on their own account, and for their own benefit; and it is therefore altogether unlikely that they would have assumed to buy back for the company, in order to sustain the market, without communicating with the company, and informing its officers of the necessity for doing so. Certainly, good faith, and the duty of full information by an agent to his principal, required them to inform the company whether they were buying them back, at the company's risk or for their own account. It is incredible, in view of the great demand for the bonds at the subscription price, that Bischoffsheim & Goldschmidt were unable ultimately to place a single bond, ex-

cept those which they purchased of the company themselves. Under all the circumstances, it seems reasonable to conclude that after the whole amount had been allotted, and when the public appetite was fierce and unappeased, Bischoffsheim & Goldschmidt commenced to buy the scrip on their own account, and for their own benefit, and continued to speculate in it until definitive bonds were deliverable, and thus had the $1,250,000 of bonds on hand at the time of making the loan to the company. Upon this state of facts the case is so clear that it can hardly be expected that any time will be spent in examining the record in order to find out whether the moneys loaned by Bischoffsheim & Goldschmidt were disbursed by John Crosby Brown and Jesse Seligman according to the alleged trust evidenced by the letter of September 30, 1873. It is enough to defeat the complainant that he does not come into court with clean hands. At the time the loan was made, the lenders had in their hands more than the amount loaned, as the proceeds of bonds which they had negotiated, which they were bound to account for to the company, and pay over to John Crosby Brown and Jesse Seligman as the trustees of the disbursement trust agreement. The equitable title to this money was in John Crosby Brown and Jesse Seligman, as trustees under that instrument, and they not only had the right to receive it from Bischoffsheim & Goldschmidt unconditionally, but it was their duty to disburse it, when received, conformably with the trusts of that instrument. If they have received it, although they have received it in the form of a loan from Bischoffsheim & Goldschmidt, and have not disbursed it as they were required to, the beneficiaries in the disbursement trust agreement can question their acts, and call them to an account; but no one else can do so. On the other hand, if the money received by them from Bischoffsheim & Goldschmidt was other money, and not the identical money that Bischoffsheim & Goldschmidt should have paid over to them, Bischoffsheim & Goldschmidt, or the complainant as survivor of that firm, cannot be permitted to assert an equitable title to it, so as to follow it into the hands of the trustees, and compel them to refund it, without doing equity, and placing the trustees in possession of what belonged to them. It would seem also that, if the trustees have an equitable title to a larger sum of money in the hands of the complainant, they can invoke the doctrine of equitable set-off to shield themselves against a recovery of the money to which the complainant claims an equitable title; and the other defendants are not liable unless the trustees are liable, because they succeeded to the rights of the trustees when they received any part of the money in controversy. Inasmuch as the defendants John Crosby Brown and Jesse Seligman have not filed a cross-bill, they cannot have any affirmative relief by way of an accounting for the money in the hands of Bischoffsheim & Goldschmidt beyond the amount received.

The decree ordered is therefore a dismissal of the bill.